**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

SEAN HAMILTON,

                                Plaintiff,                        5:15-cv-01333 (BKS/TWD)

v.

COUNTY OF ONONDAGA, NEW YORK; ETHAN
WARREN; MATT MILLIS; LARRY VANHOLTES; MARK
TOTH; FRED ISAACS; and JOHN DOE(S) and JANE DOE(S),

                               Defendants.[1]

---

**Appearances:**

*For Plaintiff:*
A.J. Bosman
Bosman Law Firm, LLC
201 W. Court Street
Rome, NY 13440

*For Defendants:*
Robert A. Durr
Onondaga County Attorney
Karen A. Bleskoski, of counsel
421 Montgomery Street, 10th Floor
Syracuse, NY 13202

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Sean Hamilton brings this action against his former employer Defendant County

of Onondaga (the "County"), as well as his former coworkers or supervisors at the County,

Defendants Ethan Warren, Matt Millus, Larry VanHoltz, Mark Toth, Fred Isaacs (the "individual

Defendants"), and unidentified individuals (John/Jane Does or "Doe Defendants"). (Dkt. No. 2).

---

[1] The Complaint erroneously refers to Defendants Millus and VanHoltz as Millis and VanHoltes, respectively.

Plaintiff, who is African-American, alleges being subjected to "racially offensive language and harassment" during his employment and terminated on the basis of race. (*Id.* ¶¶ 13–20). He brings claims for: (i) hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"); (ii) hostile work environment under the New York Human Rights Law (the "NYHRL"), N.Y. Exec. Law §§ 290–301; (iii) discrimination under Title VII; (iv) discrimination under the NYHRL; (v) violation of his rights under the Equal Protection Clause of the U.S. Constitution; (vi) violation of his rights under 42 U.S.C. § 1981; (vii) negligence; (viii) breach of contract; (ix) tortious interference with a contractual or prospective economic relationship; and (x) prima facie tort. (*Id.* ¶¶ 21–57). Plaintiff seeks, inter alia, compensatory damages, punitive damages, injunctive relief, and declaratory relief. (*Id.* at 9–10). Defendants move for summary judgment under Rule 56 of the Federal Rule of Civil Procedure. (Dkt. No. 51). For the reasons set forth below, the motion is granted in part and denied in part.

## II.     FACTS[2]

### A.     Plaintiff's Qualifications

Plaintiff is an African-American male who worked for Onondaga County's Department of Transportation (the "DOT") during the 2012–2013 and 2013–2014 winter seasons. (Dkt. No. 51-31, ¶¶ 1, 51, 100). In 2012, he obtained a "Class B" commercial driver's license ("CDL"), which is required to drive "Class B" trucks such as those used by the DOT to plow snow during the winter season.[3] (*Id.* ¶ 2; Dkt. No. 51-16, at 21–22).

---

[2] Where possible, the facts have been drawn from Defendants' statement of material facts (Dkt. No. 51-31), Plaintiff's response thereto (Dkt. No. 56-4), and the attached exhibits and affidavits.

[3] To obtain this license, Plaintiff took and passed the CDL and air brake tests in summer 2012, then rented a truck, took and passed the road test, and obtained tanker and passenger endorsements. (Dkt. No. 51-31, ¶ 3; Dkt. No. 51-16, at 19–20).

## B. Department of Transportation Workplace

The DOT has administrative offices in downtown Syracuse and four shops (garages) in Jamesville, Marcellus, Camillus, and the North Area. (Dkt. No. 51-31, ¶ 16). Each shop is managed by a highway section crew leader. (*Id.*).

Brian Donnelly, the Commissioner of the DOT during the relevant time period, made all the final decisions regarding hiring and firing of DOT employees, based on the agency's needs and staff recommendations received. (Dkt. No. 51-31, ¶¶ 14–15). The DOT has two categories of employees: permanent employees, who are represented by a union and protected by a union contract, and temporary employees, including seasonal and part-time employees, who are employed at will and have no entitlement to benefits, seniority rights, or union rights. (*Id.* ¶ 15). Temporary seasonal employees are not assured an offer of permanent employment. (*Id.* ¶ 24).[4]

Some temporary seasonal employees serve as Motor Equipment Operators I ("MEO-I") and assist permanent employees during the fall and winter months. MEO-I employees, whether temporary or permanent, must possess at a minimum a Class B CDL license and are expected to drive County-owned vehicles safely and properly operate them so as to limit wear and tear on the machinery. (Dkt. No. 51-31, ¶¶ 19–20). During the winter season, permanent employees, if available, are given priority over temporary seasonal employees in driving snowplows and working overtime. (*Id.* ¶ 21). Seasonal employees are considered "floaters" because they can be assigned to any task needed on a particular day. (*Id.* ¶ 53). There is no guarantee that temporary seasonal MEO-I employees will drive a snowplow during the season; they are expected "to assist

---

[4] Even so, Plaintiff testified that he understood that seasonal work could lead to permanent employment, (Dkt. No. 51-16, at 51–52), and that he knew of seasonal workers who had later been hired to work full time, (*id.* at 92–93).

permanent employees in whatever manner is required." (*Id.* ¶ 21).[5] The DOT does not make it a priority to train temporary employees to drive snowplows. (*Id.* ¶ 23).

The County maintains policies and procedures against harassment, discrimination, and retaliation that apply to all County employees, including those employed by the DOT. (*Id.* ¶ 7). Notably, a September 5, 2007 executive order issued by the County Executive states that discrimination, including "ethnic slurs, ethnic jokes or other intimidating, hostile or offensive verbal or physical conduct relating to a person's race," is "unacceptable conduct in the work place and will not be tolerated." (Dkt. No. 51-25, at 3). The executive order charges all "Department Heads and supervisors . . . with the responsibility to prohibit harassment and discrimination, to train employees about harassment and discrimination, and to pursue disciplinary procedures against employees who violate these procedures." (*Id.* at 4). Further, the memorandum accompanying the executive order specifies that "complaints of any type of harassment are to be reported to an appropriate management official or can be reported directly to the Employee Relations Division of the Personnel department." (*Id.* at 2).

During their initial orientation, permanent DOT employees receive a copy of the Onondaga County Employees Handbook, which contains provisions regarding harassment, discrimination, and retaliation. (Dkt. No. 51-31, ¶ 8). Further, all County employees may access the County's policies and procedures against harassment, discrimination, and retaliation on the County's intranet and through the County's Department of Personnel; they may also obtain copies of forms to report incidents from the DOT and the Department of Personnel.[6] (*Id.*). The DOT requires all permanent full-time employees to attend yearly training on issues of

---

[5] Plaintiff understood these limitations. (*See id.* ¶ 54).

[6] Defendants clarify that a form is not necessary to file a complaint of harassment or discrimination, as it can be made either orally or in writing. (Dkt. No. 51-31, ¶ 13).

discrimination, harassment, retaliation, and violence in the workplace. (*Id.* ¶ 10). Defendants Warren, Larry VanHoltz, Toth, and Isaacs testified that they attended training classes on diversity, discrimination, and retaliation. (Dkt. No. 51-31, ¶¶ 27, 35, 40, 49). Although Defendants assert that temporary seasonal employee receive similar training at the start of each season, (Dkt. No. 51-31, ¶ 11), at his deposition, Plaintiff did not recall receiving any training or information on the County's policies against harassment or discrimination, (Dkt. No. 51-16, at 29–31).

### C. Plaintiff's 2012–2013 Seasonal Employment

#### 1. Job Responsibilities and Performance

Commissioner Donnelly appointed Plaintiff to the position of temporary MEO-I at the DOT's Camillus shop by letter dated October 23, 2012. (Dkt. No. 51-31, ¶ 51; Dkt. No. 51-17). The letter informed Plaintiff that Defendant Isaacs would be his supervisor, that he would start on November 5, 2012, and that his seasonal employment would end on approximately April 19, 2013. (Dkt. No. 51-31, ¶ 51; Dkt. No. 51-17). Plaintiff was the only African-American employee at the Camillus shop at the time. (*Id.* ¶ 4).

During the 2012–2013 season, Plaintiff performed various tasks, such as shoveling, salting entrances and walkways around the shop, building maintenance, and cleaning the truck barns. (*Id.* ¶ 55). He was assigned to these tasks when employees senior to him were available to drive and there was no room for him in the trucks. (*Id.* ¶ 57). That season, he was also assigned to ride with Defendant Warren on the plow truck, and Isaacs allowed Plaintiff to drive during times of light traffic, weather permitting. (Dkt. No. 51-31, ¶¶ 59–60). Plaintiff testified that the opportunities to drive were not "that frequent." (Dkt. No. 51-16, at 32).

Warren testified that Plaintiff's driving was "[v]ery rough"—that he was rough on the standard transmission, could not get the truck "into gears all the time," would "miss a gear," and

would "grind gears." (Dkt. No. 51-11, at 21, 33–34). According to Warren, Plaintiff "didn't seem like he could get ahold of [driving the truck] all too well." (*Id.* at 22). Plaintiff denies having "any more difficulties with the truck than anyone else." (Dkt. No. 56-4, ¶ 60 (citing Dkt. No. 56-2, at 14, 19 (Jerrad Hoey, an MEO-1, testifying that he rode with Plaintiff in a six-wheeler truck and did not have comments or criticisms concerning Plaintiff's driving ability))). Warren informed Isaacs that Plaintiff "needed work" on "getting used to a standard transmission," and Isaacs responded that Plaintiff would receive "driver training"—i.e., Plaintiff would drive a truck with another individual to become "comfortable with the truck."[7] (Dkt. No. 51-11, at 22). Warren observed that Plaintiff improved, although "he was still a little rough with the manual transmission," (*id.* at 28), so Warren gave him advice on engine revving and wheel speed to make shifting easier, (*id.* at 27).[8]

Plaintiff also drove snowplows with other employees, some of whom gave him advice on his driving and on up- and downshifting. (Dkt. No. 56-4, ¶¶ 67, 68). Plaintiff testified that, with certain vehicles, "it was hard getting out of one gear into another gear, and it would slightly grind." (Dkt. No. 51-16, at 42). Hoey explained that he and Plaintiff drove "a pretty bad truck," and that "[e]verybody that drove that truck had problems." (Dkt. No. 56-2, at 13). Although Plaintiff concedes that grinding gears harms the transmission of a vehicle, he denies that he ever "harmed" any transmission. (Dkt. No. 56-4, ¶ 70; Dkt. No. 51-11, at 59 (Warren clarifying that he was "not saying that [Plaintiff] stripped gears")). Besides driving, Plaintiff acted as a

---

[7] Isaacs never rode with Plaintiff and therefore never observed his driving personally. (*See* Dkt. No. 51-31).

[8] Plaintiff denies that he remained rough with the transmission, (*see* Dkt. No. 56-4, ¶ 65), but he does not cite rebuttal evidence squarely on point. He notes that he was not assigned to drive the following season and that Isaacs did not ask Warren for a report on Plaintiff's driving ability at the end of the 2012–2013 season. (*See id.*; Dkt. No. 51-11, at 28). Nevertheless, the Court deems the point contested given Hoey's contrary testimony about Plaintiff's driving ability. (*See* Dkt. No. 56-2, at 14, 19).

wingman for Warren, who taught Plaintiff how to operate the wing on a plow, and at least six other drivers. (Dkt. No. 51-31, ¶¶ 71–73).

Isaacs testified that he received reports from DOT employees that Plaintiff was an "unsafe" driver and "not picking up the skills necessary to be driving a snowplow"—and more specifically, that he "wasn't shifting very well" nor properly operating the wing. (Dkt. No. 51-15, at 17–18). Plaintiff disputes the truth of these assessments.[9] (*See* Dkt. No. 56-4, ¶¶ 75–76). Isaacs further testified that, in response to these reports, he let Plaintiff "practice more."[10] (Dkt. No. 51-15, at 20).

On approximately December 19, 2012—about a month and a half after Plaintiff started his first season at the Camillus shop—the DOT's administrative offices forwarded Isaacs an employee performance evaluation form to complete for Plaintiff. (*See* Dkt. No. 51-2, ¶ 24; Dkt. Nos. 51-18, 51-19). Isaacs, as Plaintiff's supervisor, sought input from local crew leaders ("LCLs") in filling out the evaluation. (*See* Dkt. No. 51-18; Dkt. No. 51-15, at 105–06). Isaacs completed the evaluation on December 24, 2012, giving Plaintiff an overall evaluation of 3.5 (between "Average "and "Above Average") and a rating of 2 ("Needs improvement") for his driving ability, noting that Plaintiff "still need's a lot of driving instruction's." (Dkt. No. 51-19, at 1, 5 (spelling errors in original)). Commissioner Donnelly reviewed and signed the evaluation on January 8, 2013 and added the following comment: "Driving skills need to improve. Good review otherwise." (*Id.* at 5; *see* Dkt. No. 51-18). Isaacs subsequently reviewed the evaluation with Plaintiff, and Plaintiff signed it. (Dkt. No. 51-19, at 5; Dkt. No. 51-16, at 45–47).

---

[9] Although Plaintiff objects to these statements as hearsay, (Dkt. No. 56-4, ¶ 75), the Court notes that it has not considered the employees' statements to Isaacs for their truth.

[10] Plaintiff denies that he was allowed to practice more, since he "was not assigned to drive and thus there was no assessment of his skills in the 2013–2014 season." (Dkt. No. 56-4, ¶ 77). Isaacs' testimony, however, concerned the 2012–2013 season. (*See* Dkt. No. 51-15, at 20).

On April 4, 2013, Plaintiff went to the Jamesville shop for a driving skill evaluation by Darryl June, an LCL whose duties included driver training and evaluation of new DOT drivers. (Dkt. No. 51-3, ¶¶ 2–5). According to June, "Plaintiff was very inexperienced in pre-trip inspections, and only completed the inspection with constant prompting from me on what he needed to do." (*Id.* ¶ 6). June found that "Plaintiff was very rough in putting the vehicle in motion causing the truck to stall and jerk."[11] (*Id.* ¶ 7). In June's assessment, "Plaintiff was unable to properly up-shift," "did not understand the concept of double clutching,"[12] and failed to downshift properly. (*Id.* ¶¶ 8–9). In his affidavit, June further states that Plaintiff could not properly gauge the size of the vehicle when making turns, and "appeared to be nervous in traffic." (*Id.* ¶ 10). June adds that "Plaintiff failed to pass other vehicles safely" but that he "did follow safe backing procedures and did park and shut down the vehicle in a satisfactory manner." (*Id.* ¶¶ 11–12). June concluded that Plaintiff's driving "was unsatisfactory, and not up to County standards." (*Id.* ¶ 13; *see also* Dkt. No. 51-20).

Plaintiff's 2012–2013 seasonal employment with the DOT ended in April 2013. (Dkt. No. 51-31, ¶ 97).

### 2. Racial Comments

Plaintiff testified that, during the 2012–2013 season, he was subjected to and heard racially offensive comments at his workplace. He referred to an incident that occurred when while riding a "gang truck" with Terry VanHoltz (Defendant Larry VanHoltz's brother), Mike Farrell, and a third DOT employee. (Dkt. No. 51-16, at 49–50). They "had pulled up to the gas pump . . . at the shop," and Farrell "mentioned something about . . . mainly joking about it being

---

[11] In denying this and other assertions made by June, (*see* Dkt. No. 56-4, ¶¶ 90–96), Plaintiff cites the deposition testimony of individuals—Hoey and Warren—who were not present, and therefore have no personal knowledge of what happened, during the evaluation.

[12] June explained that "double clutching" "allows a driver to push in the clutch, take the transmission out of gear then push in the clutch again and shift the vehicle into the next gear." (*Id.* ¶ 8).

real cold out, and Terry VanHoltz said, let the nigger do it." (*Id.* at 50). Plaintiff felt that the comment was intended to offend him, but he did not say anything about it at the time. (*Id.*). The comment was made in the presence of Farrell, who, despite being "the supervisor in charge," "never did anything about it" and "never took action about it." (*Id.* at 50–51). By the end of the day, everybody had heard about the incident; Toth, Plaintiff's supervisor, "came and talked" to Plaintiff about it. (*Id.* at 77). Plaintiff told Toth that the comment made him "uncomfortable" and made him "feel less of a man." (Dkt. No. 51-16, at 77–78).

Later, Plaintiff informed Syracuse Common Councilor Khalid Bey about the incident.[13] (*Id.*). No supervisor or employee of the DOT or County, however, reported the incident to the DOT administration or the Personnel Department. (Dkt. No. 51-2, ¶ 32). Plaintiff could not recall any other racial comment made during the 2012–2013 season.[14] (Dkt. No. 51-16, at 51).

### D. Plaintiff's 2013–2014 Seasonal Employment

#### 1. Job Responsibilities and Performance

Between the 2012–2013 and the 2013–2014 seasons, Plaintiff practiced driving a truck on at least one occasion. (*Id.* at 53). A friend of his had rented a moving truck with a manual shift, and Plaintiff offered to drive the truck, as he had the requisite license. (*Id.*).

Plaintiff received a letter from Commissioner Donnelly, dated October 7, 2013, informing him that he was appointed to the position of temporary MEO-I at the Camillus shop, that Isaacs would be his supervisor, and that the season would start on October 21, 2013 and end

---

[13] Plaintiff also states that he informed Duane Owens, a County employee. (*See* Dkt. No. 56-4, ¶ 127). However, it appears from his testimony that the conversation with Owens related to another incident involving Defendant Larry VanHoltz, not Terry VanHoltz. (*See id.* at 61, 66–67). That incident is described in Part II.D.2 *infra*.

[14] Even so, Plaintiff cites Hoey's testimony that he heard racially disparaging statements by DOT supervisors, including Defendant Toth, on various occasions. (Dkt. No. 56-4, ¶ 130; Dkt. No. 56-2, at 33–35). Hoey did not specify the timeframe for these statements.

approximately on April 18, 2014.[15] (Dkt. No. 51-31, ¶ 100; Dkt. No. 51-21). Again, Plaintiff was the only African-American employee at the Camillus shop. (*Id.* ¶ 4).

Upon his return, Plaintiff was assigned duties such as flagging, pulling brush, and building maintenance. (Dkt. No. 51-16, at 54). But he was not assigned to a truck or snowplow during the 2013–2014 season. (Dkt. No. 51-31, ¶ 106). Plaintiff did not question that state of affairs because other people were already assigned to the trucks and were available to drive. (Dkt. No. 51-16, at 57). But when there were empty spots, the two new temporary employees were assigned instead of Plaintiff. (*Id.*).

In late December 2013, Isaacs completed an employee performance evaluation for Plaintiff, giving him an overall evaluation of 1 ("Needs significant improvement")[16] and a driving ability rating of -1,[17] and recommending termination of employment. (*See* Dkt. No. 51-2, ¶ 37; Dkt. No. 51-22; Dkt. No. 51-23, at 5). Commissioner Donnelly reviewed the evaluation, wrote in "Terminate employment," and signed it. (*Id.*). According to DOT records, the form was

---

[15] Isaacs, Toth, and Millus testified that some DOT employees, including Hoey, complained about Plaintiff coming back for a second season, purportedly because they thought he could not drive. (Dkt. No. 51-15, at 87–91; Dkt. No. 51-14, at 69–70; Dkt. No. 51-12, at 37–41).

[16] It is unclear how Isaacs arrived at this overall score. (*See* Dkt. No. 51-15, at 114 (Isaacs testifying that he gave Plaintiff a rating of 1 "[b]ecause he had gone down on a couple of categories" but agreeing that "you don't even get 1 as an average" of the ratings for the individual categories); *id.* (Isaacs stating, "It's the number I chose, I guess.")).

[17] At his deposition, Isaacs testified:

> Q. What did you designate his driving ability as 2013?
> A. On this sheet, minus 1.
> Q. Minus 1?
> A. Yes.
> Q. Had he gotten worse?
> A. No. We had not had him out driving.
> Q. So how could you have given him a minus 1 if he hadn't gotten worse and you hadn't had him out driving and you gave him a 2 in 2012?
> A. And he had been driving, and this year we had not gotten him out driving at all, so maybe the number was harsh, maybe it should have been a 1 instead of a minus.

(Dkt. No. 51-15, at 114–15).

returned to Isaacs and signed by him on January 24, 2014.[18] (*Id.* at 5; *see* Dkt. No. 51-22; Dkt. No. 51-15, at 81, 112, 116).

Donnelly asserts that he terminated Plaintiff "because Plaintiff was not capable of driving a truck/snowplow up to County standards and his work performance was not at the level it had been the year before." (Dkt. No. 51-2, ¶ 39). Plaintiff disputes that this was the reason for the termination and attributes it instead to "racial bias." (Dkt. No. 56-4, ¶ 116, *see* Dkt. No. 51-16, at 75 (Plaintiff testifying that his termination came "back-to-back" with the racial comments by DOT employees; Dkt. No. 56-4, at 24 (Hoey testifying that he spoke with Plaintiff about other DOT employees' use of "racially disparaging terms in his presence"); *id.* at 28–29 (Hoey testifying that DOT employees working at the Camillus shop would use racially disparaging terms at work nearly every day)). Plaintiff was advised of his termination at a meeting with Isaacs and DOT administrators. (*See* Dkt. No. 51-16, at 73–74 (Plaintiff testifying that, at that meeting, his performance was being discussed, and when a DOT administrator asked questions, Isaacs "jumped up in a rage," stating "I don't feel comfortable with him driving")). Later, Plaintiff received a termination letter from Donnelly, dated January 27, 2014, stating that his employment would end on January 28, 2014 because of "unsatisfactory work performance." (Dkt. No. 51-24). No one was hired to take Plaintiff's position after he was terminated. (Dkt. No. 51-31, ¶ 123).

Isaacs, Toth, and Millus stated at their depositions that they were surprised that Plaintiff had been terminated, and Larry VanHoltz testified that he was not aware of Plaintiff's termination until after the fact and did not know the reason for the termination; according to their testimonies, Plaintiff was doing a good job on the tasks assigned to him, and they did not want

---

[18] Asked why he did not review the evaluation with Plaintiff, Isaacs testified: "I don't think [the form] was given back to me to review with Mr. Hamilton." (Dkt. No. 51-15, at 117).

him to be terminated. (Dkt. No. 51-15, at 62; Dkt. No. 51-14, at 61; Dkt. No. 51-12, at 46; Dkt. No. 51-13, at 41–43). While Plaintiff agrees that he performed well, he denies that these Defendants did not wish or had no role in his termination, given the racial animus to which they subjected him. (Dkt. No. 56-4, ¶¶ 118–122).

### 2. Racial Comments

Plaintiff testified about several incidents in which DOT employees used racial comments during the 2013–2014 season.

### a. Warren

Defendant Warren worked as a permanent employee in the position of MEO-I from 2010 until fall 2014. (Dkt. No. 51-11, at 7, 12, 14). On one occasion, Warren lit a fire cracker in the truck barn, threw it under Plaintiff's chair, and then said to Plaintiff, "[O]h, you thought you were in the hood, huh?" (Dkt. No. 51-16, at 62, 69).[19] Plaintiff did not complain about the incident because "everybody" who worked in the Camillus shop was there, including two LCLs (John Barry and Mike Farrell), and they "condoned" the behavior and "laughed." (*Id.* at 68). More generally, Plaintiff feared that, if he complained about racial comments, he would not be able to get a permanent job with the County. (*Id.* at 72).

### b. Isaacs

As mentioned above, Isaacs was Plaintiff's supervisor. (*See supra* Part II.D.1). At his deposition, Plaintiff mentioned a comment Isaacs made to him while they "were pulling brush in the country." (Dkt. No. 51-16, at 63). Isaacs referred to him as a city person (as opposed to a country person), which offended Plaintiff because, as Plaintiff explained, Isaacs "made the assumption" that he was from the city because he was African-American and it was "more

---

[19] In a separate incident, Warren threw a firecracker under an individual's chair, causing a post-traumatic stress episode to an Army veteran employee. (Dkt. No. 51-11, at 72). Warren was suspended for 10 days. (*Id.* at 73).

common for African Americans to be part of the city life [as] opposed to the country environment, especially living in . . . Upstate New York." (*Id.*).

### c.    Toth

Defendant Toth was one of the supervisors at the Camillus shop. (Dkt. No. 51-14, at 9–12). Plaintiff testified that, when he arrived at work early in the morning on January 20, 2014, which was Martin Luther King Jr. Day, Toth was sitting in his chair and said to him, "[W]e should have kept y'all as slaves." (Dkt. No. 51-16, at 59). Plaintiff could not "believe this [was] happening," (*id.*), and he later vented to Hoey about the remark, (*id.* at 65). At his deposition, Toth recalled the incident differently. (Dkt. No. 51-14, at 53–54).). In Toth's version, he and Plaintiff "were working on [Toth's] truck," and when he saw Plaintiff wipe some grease "down his arm," Toth said, "[A]re you sure you should have been freed?" (*Id.* at 54). According to Toth, he "was just being a smart mouth, as in, do I have to take care of you, too." (*Id.*). By "freed," Toth testified he meant the state of someone who can "handle [him]self, can . . . watch [him]self," does not need to be babysat—"a not kept person." (*Id.* at 54–55). Plaintiff, however, testified that Toth had made racial jokes in his presence before, which Toth purported were not directed at Plaintiff, as well as jokes about other races. (Dkt. No. 51-16, at 59).[20]

---

[20] Toth's deposition also touched on racial or ethnic slurs in the workplace more generally:

Q.  Okay. So I'm asking you who has used racial slurs in the workplace that you've heard?
A.  Probably everybody. Who knows. I don't know. I hear people call Italians WOPs. I hear it all now and then. Nothing anyone gets upset about.
Q.  Have you used those terms?
A.  Sometimes, screwing around.
Q.  What do you mean screwing around?
A.  Just verbal banter back and forth, having fun with it, or someone saying, watch out, Barbato just walked there, it's slippery, meaning Italian. You know, that's how the guys work through the day, at the time until all this political correctness came around.

(Dkt. No. 51-14, at 25).

#### d.      John Barry[21]

On the same day, January 20, 2014, LCL John Barry said to Plaintiff, in the presence of several employees in the break room: "If we killed the Jackson 5 maybe we would have five days off and since Martin Luther King is your brother you should pay for everyone's lunch." (Dkt. No. 56-3, ¶ 5; *see also* Dkt. No. 51-16, at 61, 65–66). Isaacs was not in the room at the time. (Dkt. No. 51-16, at 65–66).

#### e.      Millus

Also on January 20, 2014, (*id.* ¶ 6), approximately one week before Plaintiff's termination, employees in the shop were asking Plaintiff about his "connections" to "get a job in the county," and Truck Barn Supervisor Millus[22] told Plaintiff, "[W]e don't want your kind here," (Dkt. No. 51-16, at 64). Isaacs was present but did not admonish or say anything to refute Millus' statement. (Dkt. No. 56-3, ¶ 6).

#### f.      Larry VanHoltz

Defendant Larry VanHoltz had retired from the DOT but returned as a part-time seasonal employee at the Camillus shop, serving as an MEO-I truck driver until February 2014. (Dkt. No. 51-13, at 7, 12, 15–16). Not recalling the situation they "were in," Plaintiff testified that Larry VanHoltz said "let the nigger do it" and that Plaintiff knew Larry VanHoltz "was referring to [him] because [he] was the only person that was black." (Dkt. No. 51-16, at 61). Plaintiff informed Duane Owens, a County employee who he knew from a previous job and felt he could trust. (*See id.* at 66–67; Dkt. No. 56-4, ¶ 127). Larry VanHoltz admitted using the N-word in Plaintiff's presence, but denied directing the slur at Plaintiff. (Dkt. No. 51-13, at 29–30). Larry

---

[21] Barry has not been named as a defendant in this action.

[22] Millus served as "Barn Boss" in the winter, and reported to Isaacs and the night supervisor. (Dkt. No. 51-12, at 12, 23–24 (Millus agreeing that he had "supervisory authority")).

VanHoltz ultimately apologized to Plaintiff. (*Id.*). After the incident, an employee told Toth about the comment, (Dkt. No. 51-14, at 24), and Toth questioned both Larry VanHoltz and Plaintiff about the incident, (*id.* at 27). Toth testified that he admonished Larry VanHoltz, (*id.* at 89), and that he spoke with Plaintiff, who he believed was not upset about the incident, (*id.* at 27).[23]

The following day, Toth informed his supervisor, Isaacs, about Larry VanHoltz' comment. (Dkt. No. 51-14, at 28). Isaacs asked Toth if he "was going to have to talk to [Plaintiff] and make a formal complaint against Mr. VanHoltz for what he said." (Dkt. No. 51-15, at 41–42). But Toth said: "I don't know, no one seems to be upset, but whatever. I'm just letting you know. . . . I don't think it's a big deal because nobody's complaining about it." (Dkt. No. 51-14, at 28). Neither Toth nor Isaacs took any further action regarding this incident. (*Id.* at 28, 89; Dkt. No. 51-15, at 44 (Isaacs testifying he "left it alone" because Plaintiff did not come to him to complain)).

### E. Procedural History

On March 4, 2014, the U.S. Equal Employment Opportunity Commission (the "EEOC") received Plaintiff's intake questionnaire.[24] (Dkt. No. 56-2). Approximately a month later, on April 17, 2014, Plaintiff filed a complaint with the EEOC and the New York State Division of

---

[23] Asked whether he ever used the N-word himself, Toth testified, "I don't believe so. I might have. I don't know." (Dkt. No. 51-14, at 27). Hoey said he heard Toth "say the N word numerous times," including in reference to a DOT employee who had a black child. (Dkt. No. 56-2, at 30). Hoey, however, did not provide a time frame for these incidents. Plaintiff also testified that Toth "made some racial jokes and then tried . . . to clean it up and say, well, I'm not talking about you, though, but he had made racial jokes to me and even regards to other races, as well." (Dkt. No. 51-16, at 59).

[24] Defendants assert in their reply brief that Plaintiff failed to produce this questionnaire, as well as the December 30, 2014 determination of the director of the EEOC's Buffalo Local Office (Dkt. No. 56-2), in discovery. (*See* Dkt. No 57, at 4). In deciding Defendants' motion, the Court has not considered the contents of these documents as part of the factual record; the Court refers to these documents solely for purposes of laying out the procedural history.

Human Rights (the "NYDHR") against the DOT, alleging race discrimination and retaliation.[25] (Dkt. No. 51-5). The EEOC issued a notice of right to sue on June 9, 2015. (Dkt. No. 51-6). Plaintiff then initiated a lawsuit against Defendants in New York Supreme Court, Onondaga County, by summons with notice on September 11, 2015, (Dkt. No. 51-7), and filed his complaint on October 19, 2015, (Dkt. No. 2). Defendants filed a notice of removal to this Court on November 10, 2015. (Dkt. No. 1).

## III.     STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where

---

[25] Defendants incorrectly argue that "Plaintiff chose to proceed through the NY Division of Human Rights." (Dkt. No. 57, at 7). Instead, Plaintiff filed his complaint with the EEOC, which cross-filed it with the New York State Division of Human Rights. (Dkt. No. 51-5, at 2). The election-of-remedies doctrine, which usually bars litigation of NYHRL claims brought before the NYDHR, does not apply "when a claim is filed directly with the EEOC rather than with the [DHR], and is only thereafter filed with the [DHR] by the EEOC in accordance with Title VII requirements that all complaints filed with the EEOC be referred to the local agency." *Williams v. City of New York*, 916 F. Supp. 2d 517, 522 (S.D.N.Y. 2013) (internal quotation marks omitted).

the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (quoting Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

IV.    **DISCUSSION**

    A.    **Race Discrimination**

Title VII, in relevant part, provides that it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Discrimination claims under Title VII are generally evaluated

under the *McDonnell Douglas*[26] burden-shifting analysis. *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 92 (2d Cir. 2013); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). First, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. *Hicks*, 509 U.S. at 506. "The requirements to establish a prima facie case are 'minimal,' and a plaintiff's burden is therefore 'not onerous.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (citation omitted) (first quoting *Hicks*, 509 U.S. at 506; then quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The establishment of a prima facie case creates a presumption that the employer unlawfully discriminated against the employee. *Hicks*, 509 U.S. at 506. The burden then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *Id*. at 507. If the defendant carries that burden, the presumption of discrimination "drops from the picture," and the burden shifts back to the plaintiff, who must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *see Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013). "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock*, 224 F.3d at 42 (alterations in original) (internal quotation marks omitted).

### 1. Prima Facie Case

To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position he

---

[26] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Bennett v. Hofstra Univ.*, 842 F. Supp. 2d 489, 497 (E.D.N.Y. 2012) (citing *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 491–92 (2d Cir. 2009)). The fourth factor of this test may be satisfied either by "(1) direct evidence of discriminatory intent, or (2) a showing by the Plaintiff that '[he] was subjected to disparate treatment . . . [compared to persons] similarly situated in all material respects to . . . [himself].'" *Bennett*, 842 F. Supp. 2d at 497 (alterations in original) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). There is no dispute, for purposes of this motion, that Plaintiff satisfies the first prong of the prima facie case. (Dkt. No. 51-32, at 7). Defendants contend, however, that "Plaintiff cannot establish the remaining three prongs." (*Id.*).

Regarding the second prong, Defendants contend that Plaintiff "was not able to properly drive a County truck/snowplow, and therefore, Plaintiff was not qualified for the position." (*Id.* at 8). That fact, however, is clearly disputed; Plaintiff has adduced evidence that he could drive the County's trucks and snowplows. (Dkt. No. 51-16, at 19–22; Dkt. No. 56-2, at 14, 19, 53). Therefore, Plaintiff has met his de minimis burden to establish that he was qualified for the position.

As to the third prong, Defendants argue that Plaintiff's termination prior to the end of the season was not an adverse action because he "was given no assurances that he would remain in temporary employ for the entire period." (Dkt. No. 51-32, at 9). They add that "the alleged racial slurs and comments are not a materially adverse change to the terms and conditions of Plaintiff's employment," and "there is no link between the alleged discriminatory comments and any tangible job benefits." (*Id.* at 8). Further, Defendants maintain that the fact that Plaintiff was not permitted to drive was not an adverse action because "as a temporary seasonal employee there

was no guarantee that he would be driving truck/snowplows," and "being given less desired work assignments is not a materially adverse change in employment." (*Id.* at 9).

While "verbal abuse is typically insufficient to constitute an adverse employment action because [n]egative or otherwise insulting statements are hardly even actions, let alone adverse actions," *Scott v. N.Y.C. Dep't of Corr.*, 641 F. Supp. 2d 211, 231 (S.D.N.Y. 2009) (alteration in original) (internal quotation marks omitted), the Second Circuit has deemed that "a termination of employment, . . . significantly diminished material responsibilities, or other indices . . . unique to a particular situation" are employment actions "sufficiently disadvantageous to constitute an adverse employment action," *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (internal quotation marks omitted). Courts have also deemed "denial of training that may lead to promotional opportunities," *Little v. NBC*, 210 F. Supp. 2d 330, 384 (S.D.N.Y. 2002), and being given "[c]omparatively poor assignments," *Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 325 (E.D.N.Y. 2014) (alteration in original), to be adverse employment actions. The Court finds that Plaintiff's termination constitutes an adverse employment action; furthermore, there are triable issues of fact as to whether being denied permission to drive trucks and assigned disfavored tasks constitute additional adverse employment actions.

With regard to the fourth prong, Defendants argue that there can be no inference of unlawful discrimination because Donnelly, the person who hired and fired Plaintiff, "was not aware of any of the alleged racial comments . . . in that no complaints were ever forwarded to the Commissioner's office." (Dkt. No. 51-32, at 9–10). Defendants also assert that Defendant "Isaacs played no role in the final decision to terminate Plaintiff's temporary employment." (*Id.* at 10). But under Second Circuit precedent, "a Title VII plaintiff is entitled to succeed, even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the

individual shown to have the impermissible bias played a meaningful role in the [decisionmaking] process." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) (alteration in original) (internal quotation marks omitted); *see also McCowan v. HSBC Bank USA, N.A.*, 689 F. Supp. 2d 390, 411 (E.D.N.Y. 2010) (denying summary judgment where "a reasonable jury could find that Ms. Lin's alleged discriminatory bias toward plaintiff, if proven, infected the decision-making process that ultimately resulted in plaintiff's termination"). Here, Plaintiff has shown "direct evidence of discriminatory intent," *Bennett*, 842 F. Supp. 2d at 497, including by adducing evidence that Isaacs, the individual who first recommended Plaintiff's termination, made a racially biased comment to him during the 2013–2014 season, (Dkt. No. 51-16, at 63), and, on January 20, 2014, just four days before Isaacs signed Commissioner Donnelly's directive to terminate Plaintiff, (Dkt. No. 51-23, at 5), Isaacs was present but did nothing when Millus told Plaintiff, the only African American at the Camillus shop, "[W]e don't want your kind here," (Dkt. No. 51-16, at 64; Dkt. No. 56-3, ¶ 6). Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that he has satisfied his prima facie burden of showing discriminatory intent and causation.[27]

### 2.    Legitimate Nondiscriminatory Reasons

As Plaintiff has established a prima facie case of discrimination, a presumption of discrimination arises, and the burden shifts to Defendants to demonstrate some legitimate, nondiscriminatory reason for the adverse actions. *McDonnell Douglas Corp.*, 411 U.S. at 802; *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011). Defendants have satisfied their burden here with evidence that the decisions to terminate him, deny him permission to drive trucks, and

---

[27] Defendants also assert that a Caucasian employee from a different shop was terminated before the end of the 2013–2014 season and that no one replaced Plaintiff after he was terminated. (Dkt. No. 51-32). Defendants do not explain the relevance of these facts in a situation, like the one alleged here, involving overt expressions of racial animus. Further, the record indicates that no one except Plaintiff was terminated before the end of the 2013–2014 season at the Camillus shop. (Dkt. No. 51-12, at 85).

assign disfavored tasks were based on the legitimate, nondiscriminatory reason that Plaintiff did not possess the requisite driving skills. (Dkt. No. 51-2, ¶ 39; Dkt. No. 51-23; Dkt. No. 51-24). Therefore, the burden shifts back to Plaintiff to establish that this reason was a pretext for discrimination. *Weinstock*, 224 F.3d at 42.

### 3. Pretext

A plaintiff's burden at the third stage of the *McDonnell Douglas* burden-shifting analysis is to produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock*, 224 F.3d at 42 (alterations in original) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)). In other words, the Court must "now ask whether, without the aid of the presumption" of discrimination raised by the prima face case, the plaintiff "has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire him was based, at least in part, on the fact that [he] was black." *Holcomb v. Iona College*, 521 F.3d 130, 141 (2d Cir. 2008). "[A] plaintiff may rely on evidence comprising [his] prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). Pretext may be shown, inter alia, "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate" nondiscriminatory reasons for its action. *Id*. at 846. Further, "[w]hile departures from regular procedures 'can raise a question as to the good faith of the process where the departure may reasonably affect the decision,' summary judgment is appropriate where 'whatever irregularities existed' were either unrelated to discrimination or 'did not affect the final [adverse]

decision.'" *Hiramoto v. Goddard Coll. Corp.*, 684 F. App'x 48, 50 (2d Cir. 2017) (quoting *Weinstock*, 224 F.3d at 41, 45).

Pointing to the "inexplicabl[e]" scores in the 2013–2014 evaluation, Plaintiff argues that there is "significant evidence of pretext." (Dkt. No. 56, at 9–10). The Court agrees. Defendant Isaacs gave Plaintiff a rating of -1 on his driving ability during the 2013–2014 season, even though Plaintiff was never assigned to drive a truck during that time period. (*See* Dkt. No. 51-23, at 5). At his deposition, Isaacs recognized that the rating was "harsh," and he did not appear to have a clear explanation for it. (Dkt. No. 51-15, at 114–15). Likewise, Isaacs gave Plaintiff a low overall rating of 1, despite Plaintiff's relatively strong scores on the underlying evaluation categories, (*see* Dkt. No. 51-23), and positive assessments from coworkers, (*see* Dkt. No. 51-15, at 62; Dkt. No. 51-14, at 61; Dkt. No. 51-12, at 46; Dkt. No. 51-13, at 41–43). Given the many racial comments directed at Plaintiff during his employment—including Millus' comment to Plaintiff, the only African American at the Camillus shop, just days before his termination, that "we don't want your kind here," and Isaacs' failure, despite hearing the comment, to refute it or admonish Millus, (Dkt. No. 51-16, at 64; Dkt. No. 56-3, ¶ 6)—a reasonable jury could conclude that the scores were not an accurate picture of Plaintiff's performance but instead a means of covering up an illegitimate basis for his termination. Based on this evidence, the Court concludes that Plaintiff has raised material issues of fact about whether he was terminated based on race. Accordingly, Defendants' motion for summary judgment on Plaintiff's Title VII race discrimination claim is denied.[28]

---

[28] Defendants correctly point out that, to the extent that the individual Defendants are sued in their official capacities, the claims "are the functional equivalents of a suit against Onondaga County." (Dkt. No. 51-32, at 6 (citing *Rosa R. v. Connelly*, 889 F.2d 435, 437 (2d Cir. 1989))). They also note that "individuals are not subject to liability under Title VII." (*Id.* (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004))). Plaintiff does not respond to these points, which are well-taken. The Court therefore dismisses any claims against the individual Defendants in their official capacities and under Title VII.

**B.      Hostile Work Environment (Title VII)**

A hostile work environment claim requires a showing that: (1) "the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). "To survive summary judgment on a hostile work environment claim, a plaintiff must first show 'either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [the plaintiff's] working environment.'" *Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000)), *aff'd*, 629 F.3d 276 (2d Cir. 2010). "Where reasonable jurors could disagree . . . the issue of whether a hostile work environment existed may not properly be decided as a matter of law." *Patterson*, 375 F.3d at 227.

The hostile work environment standard "includes both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). "To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) (quoting *Alfano*, 294 F.3d at 374). Thus, the factors courts consider in evaluating whether a hostile work environment exists include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (quoting

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). But "a plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010). Further, there is "neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 22 n.5 (2d Cir. 2014) (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 439 (2d Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

To establish a hostile work environment, Plaintiff must also demonstrate that the offending conduct occurred because of his membership in a protected class, such as race, or because of a protected activity. *See Blake v. Potter*, 330 F. App'x 232, 234 (2d Cir. 2009) (citing *Alfano*, 294 F.3d at 373); *see also Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 244 (E.D.N.Y. 2015). "Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on" membership in a protected class or protected activity. *Alfano*, 294 F.3d at 378. However, there must be "some circumstantial or other basis" for inferring that facially neutral incidents were in fact discriminatory or retaliatory. *Id.*

### 1.     Severity and Pervasiveness of Conduct

Defendants argue that "Plaintiff is unable to establish that any of the alleged actions were severe or pervasive, nor can he establish that certain of the alleged actions were based on his race." (Dkt. No. 51-32, at 12). In their view, the conduct was not sufficiently severe or pervasive

because it involved "only one incident of allegedly racist language being used in the 2012–2013 season, and only four such alleged uses of, arguably, racist language during the 2013–2014 season." (*Id.* at 15). However, the evidence in the record, when viewed in the light most favorable to Plaintiff, raises material issues of fact as to whether there was a racially hostile work environment.

First, Plaintiff has presented a great deal of evidence that the racial comments he was subjected to at the DOT were pervasive. There is at least one specific instance of such conduct during the 2012–2013 season, (*see* Dkt. No. 51-16, at 50 (Terry VanHoltz telling others on the "gang truck," while stopping at the gas pump to refill the tank on a cold day, "let the nigger do it")), and at least five other incidents during Plaintiff's 2013–2014 seasonal employment (which lasted only three months), including: (1) Warren lighting and throwing a fire cracker under Plaintiff's chair, then exclaiming, "[O]h, you thought you were in the hood, huh?," (*id.* at 62, 69); (2) Toth telling Plaintiff on January 20, 2014, Martin Luther King Jr. Day, "[W]e should have kept y'all as slaves," (*id.* at 59); (3) Barry[29] stating on the same date, "If we killed the Jackson 5 maybe we would have five days off and since Martin Luther King is your brother you should pay for everyone's lunch," (Dkt. No. 56-3, ¶ 5); (4) Millus saying to Plaintiff, also on January 20, 2014, "We don't want your kind here," (Dkt. No. 51-16, at 64); and (5) Larry VanHoltz uttering the phrase "let the nigger do it." (*id.* at 61).[30] Additionally, Hoey testified that "for the most part" the use of racially disparaging terms, including the N-word, was a common, everyday occurrence at the Camillus shop. (Dkt. No. 56-2, at 29). A reasonable jury could find

---

[29] Although Barry is not an individual defendant, his comment could be imputed to the County. *See infra* __.

[30] Plaintiff also testified that Isaacs referred to him as a "city person" while "pulling brush in the country." (Dkt. No. 51-16, at 63). Although it could be argued that Isaacs' statement is facially neutral, a reasonably jury could conclude that it was, in fact, based on" membership in a protected class or protected activity. *Alfano*, 294 F.3d at 378. A jury could credit Plaintiff's testimony that this comment was racially charged in the context in which it was made. (*See* Dkt. No. 51-16, at 63–64, 70).

that these "racist comments, slurs, and jokes" were "more than a few isolated incidents of racial enmity" but rather amounted to "a steady barrage of opprobrious racial comments." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks omitted); *see also Leifer v. N.Y. State Div. of Parole*, 391 F. App'x 32, 36 (2d Cir. 2010) (reversing the district court's dismissal of a hostile work environment claim because the six incidents of alleged harassment, "[w]hen viewed *in toto*, . . . drawing all reasonable inferences in [the plaintiff's] favor, [created] a genuine issue of fact whether the acts in question had an adverse effect on, or altered the conditions of, [the plaintiff's] employment"). Thus, viewing the evidence in the light most favorable to Plaintiff, there is a triable issue of fact regarding whether the DOT employees' racial comments were sufficiently pervasive to create a hostile work environment.

Second, as to the severity of the offending conduct, a reasonable juror crediting Plaintiff's testimony and assessing the various racially comments made by the DOT employees could find them offensive and humiliating. Plaintiff told his supervisor, Defendant Toth, that the slur used by Terry VanHoltz made him "uncomfortable" and made him "feel less of a man." (Dkt. No. 51-16, at 77–78). Although he did not file internal complaints—he did, however, raise the issue with Syracuse Common Councilor Khalid Bey and County employee Duane Owens, (*id.* at 66–67, 77–78)—Plaintiff explained that he feared that, if he complained about racial comments, he would not be able to get a permanent job with the County, (*id.* at 72). Further, Plaintiff saw a psychologist to cope with this experience, and was prescribed Zoloft to deal with the stress. (*Id.* at 83–85, 87). Accordingly, based on the totality of the circumstances, Plaintiff has raised a triable issue of fact as to whether he was subjected to a discriminatory hostile work environment. *See Hawkins v. County of Oneida*, 497 F. Supp. 2d 362, 375–76 (N.D.N.Y. 2007) (denying summary judgment where the plaintiff "raised questions of fact as to whether he was

subjected to discriminatory intimidation, ridicule, and insult that was so severe or pervasive that it altered the conditions of his employment and created an abusive working environment").

## 2. Basis for Imputation

The standard for imposing liability on an employer for workplace harassment by employees depends on the status of the harasser:

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. Under this framework, therefore, it matters whether a harasser is a "supervisor" or simply a co-worker.

*Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (citations omitted) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)). In *Vance*, the Supreme Court further held that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.* "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

There appears to be no dispute that the County took a tangible employment action, as Plaintiff was ultimately terminated. The parties, however, contest whether the County failed to exercise reasonable care in controlling workplace conditions—an issue relevant to whether to

impute coworker or supervisor harassment to the employer.[31] (*See* Dkt. No. 51-32, at 15–16 (Defendants contending that the DOT employees' conduct cannot be imputed to the County because the County had policies and procedures for reporting harassment but Plaintiff did not report or complaint about the racial comments); (Dkt. No. 56, at 16 (Plaintiff responding that there is "evidence that Defendant employer was negligent as it ignored facts and failed to take appropriate corrective or protective action")).[32]

To establish an employer's negligence in controlling workplace conditions, a plaintiff must demonstrate that his employer: (i) "failed to provide a reasonable avenue for complaint"; or (ii) "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000)); *accord Vance*, 570 U.S. at 449 (noting that a plaintiff could show that his "employer was negligent in failing to prevent harassment from taking place" with, inter alia, "[e]vidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed"). The second avenue of vicarious liability (knowledge and failure to act) "requires a plaintiff to show that (1) *someone*

---

[31] The party bearing the burden of proof, however, is different in the two situations. To impute coworker harassment to the employer, the plaintiff must prove that "the employer . . . was negligent in controlling working conditions." *Vance*, 570 U.S. at 424. On the other hand, supervisor harassment is imputed to the employer unless the defendant can show that the employer was not negligent in preventing or correcting workplace harassment and that the plaintiff unreasonably failed to take advantage of the preventative and corrective opportunities provided. *See id.*

[32] The parties use the term "supervisor" in a broader sense than the *Vance* definition. For example, Defendants state that Toth had "supervisory authority over Plaintiff," (Dkt. No. 56-4, ¶ 41), and that Isaacs was Toth's and Plaintiff's supervisor, (*id.* ¶ 47, 51, 100). Defendants also acknowledge that Isaacs was "aware that as a supervisor he [was] responsible for forwarding any complaints or racial harassment or discrimination for the filing of a formal complaint." (*Id.* ¶ 50). On the other hand, Plaintiff admits that "Donnelly made hire and fire decisions," (Dkt. No. 56-4, ¶ 14), and that Isaacs could "make recommendations to his supervisors regarding hiring and firing, but [did] not make the final decisions regarding hiring and firing," (*id.* ¶ 48). While the Court assumes without deciding that Isaac and Toth were not supervisors under *Vance*, the Court finds, based on Defendants' own representations, that there are questions of fact as to whether they were supervisors under County policy and had a duty to report harassment. (*See infra* p. 30).

had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable." *Duch*, 588 F.3d at 763. An employee's actual or constructive knowledge can be imputed to the employer "when principles of agency law so dictate"—i.e., when the employee is: (a) "at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company"; (b) "charged with a duty to act on the knowledge and stop the harassment"; or (c) "charged with a duty to inform the company of the harassment." *Id.* (quoting *Torres v. Pisano*, 116 F.3d 625, 636–37 (2d Cir. 1997)).

Under a September 5, 2007 executive order by the County Executive and its accompanying memorandum, "Department Heads and supervisors" have a duty to take preventative and corrective measures against workplace harassment, and "complaints of any type of harassment are to be reported to an appropriate management official or can be reported directly to the Employee Relations Division of the Personnel department." (Dkt. No. 51-25, at 2, 4). Based on Defendants' own representations, Isaacs and Toth were "supervisors" with a duty to report harassment under County policy. (Dkt. No. 51-31, ¶¶ 41, 50, 51, 100). Further, there is evidence that Isaacs and Toth had actual knowledge of some—and, a jury could reasonably infer, constructive knowledge of all—the racial incidents occurring during Plaintiff's employment, (*see* Dkt. No. 51-16, at 59, 63, 77–78; Dkt. No. 56-3, ¶ 6; Dkt. No. 51-14, 24, 27–28; Dkt. No. 51-15, at 41–42); given their reporting duties, their knowledge can be imputed to the County under *Duch*. It is uncontested that no Defendants took any action to address those incidents. Therefore, under *Duch*, Plaintiff has met his burden to raise triable issues of fact concerning the County's negligence. Defendants' motion for summary judgment on the hostile environment claim is denied.

## C.    Equal Protection and Section 1981 (Claims Under § 1983)

Defendants seek summary judgment dismissing Plaintiff's § 1983 claims against the

County, arguing that Plaintiff failed to establish a municipal policy that caused constitutional

deprivations, (*see* Dkt. No. 51-32, at 16–18), and against the individual Defendants, arguing that

Plaintiff failed to establish their personal involvement in any racial discrimination or violation of

Plaintiff's right to equal protection, (*see id.* at 18–21).

### 1.    Municipal Liability

"For the purpose of Section 1983, a municipality is not vicariously liable for the acts of

its employees," *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Monell v.

Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)), but a municipality is liable when "execution of a

government's policy or custom, whether made by its lawmakers or by those whose edicts or acts

may fairly be said to represent official policy, inflicts the injury," *Monell*, 436 U.S. at 694. "To

hold a municipality liable in such an action, 'a plaintiff is required to plead and prove three

elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a

denial of a constitutional right.'" *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995)

(quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

A municipal policy or custom may be established where the facts show either: (1) a

formal policy, officially promulgated by the municipality, *Monell*, 436 U.S. at 690; (2) action

taken by the official responsible for establishing policy with respect to a particular issue,

*Pembaur v. Cincinnati*, 475 U.S. 469, 483–84 (1986); (3) unlawful practices by subordinate

officials so permanent and widespread as to practically have the force of law, *City of St. Louis v.

Praprotnik*, 485 U.S. 112, 127–30 (1985); or (4) a failure to train or supervise that amounts to

"deliberate indifference" to the rights of those with whom the municipality's employees interact,

*City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "[A] municipal policy may be inferred from

the informal acts or omissions of supervisory municipal officials." *Zahra*, 48 F.3d at 685.

Further, "municipal inaction such as the persistent failure to discipline subordinates who violate

civil rights could give rise to an inference of an unlawful municipal policy of ratification of

unconstitutional conduct." *Batista*, 702 F.2d at 397; *see also Turpin v. Mailet*, 619 F.2d 196, 200

(2d Cir. 1980) (holding that "where senior personnel have knowledge of a pattern of

constitutionally offensive acts by their subordinates but fail to take remedial steps, the

municipality may be held liable for a subsequent violation if the superior's inaction amounts to

deliberate indifference or to tacit authorization of the offensive acts").

Plaintiff argues that "there is more than sufficient evidence to show that supervisory

municipal officials were deliberately indifferent to Plaintiff's constitutional rights to be free from

discriminatory treatment." (Dkt. No. 56). As discussed in the previous sections, there is evidence

that Plaintiff's supervisors, Toth and Isaacs, knew about yet failed to address severe and

pervasive racial harassment and discrimination at his workplace in violation of Title VII. And it

is well-established that "[m]ost of the core substantive standards that apply to claims of

discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in

employment in violation of § 1981 or the Equal Protection Clause" brought under § 1983.

*Patterson*, 375 F.3d at 225. But municipal liability attaches only if "higher ranking officials with

policymaking authority" "ordered or ratified the subordinates' actions" or were "aware of a

subordinate's unconstitutional actions, and consciously chose to ignore them, effectively

ratifying the actions." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004).

Policymaking officials are those "decisionmaker[s] possess[ing] final authority to establish

municipal policy with respect to the action ordered," which is "granted directly by legislative

enactment or . . . delegated by an official who possesses such authority." *Pembaur v. City of*

*Cincinnati*, 475 U.S. 469, 482–83 (1986). There is evidence in the record that, when viewed in the light most favorable to Plaintiff, indicates that Toth and Isaacs were aware of—indeed, they participated in—the alleged racial harassment and discrimination, and that Plaintiff told a County employee, Duane Owens, about the racial comments. But the parties have not adequately briefed whether any of these individuals had policymaking authority or addressed the potential theories of liability in more than a conclusory manner. In these circumstances, the Court declines to grant summary judgment on the *Monell* claims.

### 2. Personal Involvement of Individual Defendants

Defendants seek summary judgment in favor of Warren, Millus, VanHoltz, Toth, and Isaacs for lack of personal involvement in violating Plaintiff's constitutional rights, but their arguments actually touch on whether these individuals' actions, taken in isolation, would violate those rights. (*see* Dkt. No. 51-32, at 18–21 (arguing, for example, that "none of their comments, considered individually, were sufficiently severe to alter the conditions of Plaintiff's employment)). Individual liability for claims brought under § 1983 (in this case, the equal protection and § 1981 claims) requires personal involvement, which "includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring." *Patterson*, 375 F.3d at 229.

As discussed above in analyzing Title VII claims, (*see supra* Parts IV.A and IV.B), each of the individual Defendants made racially offensive comments and in this sense directly participated—and were therefore personally involved—in the alleged racial discrimination and hostile work environment alleged by Plaintiff, *see Beechwood Restorative Care Ctr. v. Leeds*, 811 F. Supp. 2d 667, 675 (W.D.N.Y. 2011) (stating that a plaintiff must establish that "the defendant was personally involved in the violation of plaintiffs' rights, and that each defendant

contributed to plaintiffs' injury"). Viewing the evidence in the light most favorable to Plaintiff, the Court cannot conclude, contrary to Defendants' apparent suggestion, (Dkt. No. 51-32, at 19; Dkt. No. 57, at 6–7), that the "multiple individual defendants have engaged in uncoordinated and unplanned acts of harassment" so that "each defendant is only liable under § 1983 when his own actions are independently sufficient to create a hostile work environment," *Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014). Given evidence that the individual Defendants' racial comments were made in the presence of or with the knowledge of other individual Defendants, (*see, e.g.*, Dkt. No. 51-16, at 50–51, 61–62, 64, 68–69, 77–78), a reasonable jury could find that the individual Defendants acted jointly to cause a racially hostile work environment, *see Raspardo*, 770 F.3d at n.21 (noting that "[j]ointly planned or perpetrated acts of harassment . . . may be attributed to each of the defendants," and that conspiracies "may be inferred from the actions of multiple parties who are aware of, and intentionally commit acts to further, a common project"); *cf. Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 315 (7th Cir. 2010) (noting that "liability among defendants in a § 1983 case is *joint* and several—at least in the usual case of one plaintiff with a single indivisible injury").

Further, even if the Court were to consider each individual Defendant's conduct in isolation to determine if it rises to the level of racial discrimination or hostile work environment necessary to establish personal liability under § 1983, (*see* Dkt. No. 51-32, at 19), the evidence in the record is "sufficient to withstand the motion for summary judgment," *Patterson*, 375 F.3d at 213, 229–30 (affirming denial of summary judgment as to "two remaining individual defendants," where there was evidence that one had made a racially offensive remark to the plaintiff, who was black, and the other refused to acknowledge the plaintiff while speaking to and saluting white officers). Although "[i]solated incidents usually will not suffice to establish a

hostile work environment," the Second Circuit has "often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently 'severe.'" *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012). Whether each of the individual Defendants' "alleged conduct occurred and whether, in light of the totality of the circumstances, it was sufficiently humiliating to alter the conditions of [Plainitiff's] employment are questions to be answered by a factfinder." *Patterson*, 375 F.3d at 213, 229–30.

Lastly, to the extent that Defendants advance the same substantive arguments for dismissal of the § 1983 claims as those for dismissal of the Title VII claims, the Court rejects them for the reasons stated above. *See id.* at 225 (explaining that the same substantive standards of conduct apply under Title VII, § 1981, and the Equal Protection Clause). As for their contention that Defendants Warren, Millus, and VanHoltz are entitled to qualified immunity, (Dkt. No. 51-32, at 19), the Court agrees with Plaintiff that they have failed to discharge their burden of showing that "no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." (Dkt. No. 56, at 23 (quoting *Ford v. Moore*, 237 F.3d 156, 162 (2d Cir. 2001))). Accordingly, the Court denies Defendants' motion for summary judgment on the § 1983 claims.

### D. State Law Claims

#### 1. Notice of Claim

Defendants seek dismissal of some of Plaintiff's state law claims—claims under the NYHRL (second and fourth causes of action) and tort claims for negligence (seventh cause of action), tortious interference (ninth cause of action), and prima facie tort (tenth cause of action)—on the ground that Plaintiff failed to follow procedural requirements for bringing suit

against municipalities. Because the requirements vary depending on the claim and the type of defendant, the Court undertakes a differentiated analysis below.

<blockquote>a.   NYHRL and Tort Claims Against County Defendant</blockquote>

For any claim against a county alleged to have been caused by "any misfeasance, omission of duty, negligence or wrongful act on the part of the county, its officers, agents, servants or employees," a plaintiff must serve a notice of claim on the county in accordance with section 50-e of the New York General Municipal Law ("Municipal Law"). N.Y. Cnty. Law § 52. Section 50-e provides that a plaintiff must serve the county within 90 days of the claim's accrual. N.Y. Gen. Mun. Law § 50-e(1)(a). The requirement applies to tort and discrimination claims, G*rasso v. Schenectady Cty. Pub. Library*, 30 A.D.3d 814, 816 (3d Dep't 2006), but not claims for breach of contract, *Smith v. Rise E. Sch.*, 120 A.D.2d 726, 726 (2d Dep't 1986). Notably, while a notice of claim is generally not required for a NYHRL claim against a municipality, *see Gentile v. Town of Huntington*, 288 F. Supp. 2d 316, 320 (E.D.N.Y. 2003), it is required for a NYHRL claim against a county, *see Keating v. Gaffney*, 182 F. Supp. 2d 278, 290–291 (E.D.N.Y. 2001) (noting that "employment discrimination claims [brought] against municipal as opposed to county defendants are exempt from the notice of claim requirement"). It is undisputed that Plaintiff did not serve a notice of claim on the County. Therefore, the Court dismisses the NYHRL, negligence, tortious interference, and prima facie tort claims against the County.[33]

---

[33] An exception to the notice-of-claim requirement is available if an "action has been brought to vindicate a public interest or leave to serve late notice has been granted by the court." *Mills v. Monroe County*, 59 N.Y.2d 307, 308 (1983). However, this individual civil-rights action does not fall within the public-interest exception to the notice-of-claim requirement, *see Drees v. County of Suffolk*, No. 06-cv-3298, 2007 WL 1875623, at *14, 2007 U.S. Dist. LEXIS 46618, at *45–46 (E.D.N.Y. June 27, 2007), and Plaintiff has not sought leave to file a late notice of claim.

### b. Negligence Claim Against Individual Defendants

Section 50-e of the Municipal Law, which section 52 of the New York County Law (the "County Law") cross-references,[34] provides that service of a notice of claim on a municipal employee is not "a condition precedent to the commencement of an action against such person," but a notice of claim must be served on the municipality if the municipality "has a statutory obligation to indemnify such person under this chapter or any other provision of law." N.Y. Gen. Mun. Law § 50-e(1)(b); *see, e.g.*, *Allen v. Antal*, 665 F. App'x 9, 14 (2d Cir. 2016) (affirming dismissal of a negligence claim against a county clerk because the plaintiff "failed to comply with New York's notice of claim requirements"); *Ayers v. Mohan*, 154 A.D.3d 411, 413 (1st Dep't 2017) (dismissing a malpractice claim against a doctor employed by a county because the county had an obligation to indemnify and defend the doctor against malpractice claims but the plaintiffs did not serve a notice of claim on the county). A municipality must indemnify its employees for any judgment or settlement arising from acts or omissions occurring "while the employee was acting within the scope of his public employment or duties," but only if the municipality's governing body has formally agreed to indemnify its employees. N.Y. Pub. Off. Law § 18(2), (4)(a).

As the record indicates, in 1990, the County's legislative body adopted Resolution No. 168, which provides that the County will indemnify its employees for any judgment or settlement of a claim, provided that "the act or omission from which such judgment or claim arose occurred while the employee was acting in good faith within the scope of his public employment or duties." (Dkt. No. 51-7, at 3). With respect to the negligence claim, the

---

[34] Further, because section 50-e applies to suits against "public corporations" generally—a term that encompasses municipal entities, including counties—a fortiori it applies to suits against counties more specifically. *See* N.Y. Gen. Constr. Law § 66 (defining a "public corporation" as including a "municipal corporation," which itself includes "a county, city, town, village [or] school district"); *accord Bradshaw v. City of New York*, No. 17-cv-1199, 2017 WL 6060781, at *15, 2017 U.S. Dist. LEXIS 201819, at *38 (S.D.N.Y. Dec. 7, 2017).

Complaint charges Defendants with breaching "a duty of care in keeping Plaintiff's work environment free of discrimination and harassment." (Dkt. No. 2, ¶ 42). That duty necessarily arises within the scope of Defendants' employment. Because the County has an obligation to indemnify the individual Defendants for any judgment arising out of the alleged negligent acts, Plaintiff had to serve the County with a notice of claim under section 50-e of the Municipal Law. As Plaintiff failed to do so, the Court must dismiss his negligence claim against the individual Defendants.

### c. NYHRL Claim Against Individual Defendants

Before addressing Defendants' procedural argument for dismissal of the NYHRL claim against the individual Defendants, the Court must address the substantive standard for individual liability under the NYHRL, as Defendants appear to raise this issue in their briefing. (*See* Dkt. No. 51-32, at 18–19). Individual liability under the NYHRL exists in two ways. For one thing, an individual may be liable as an employer under section 296(1)—which, in relevant part, makes it unlawful for an employer "to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment" on the basis of race, N.Y. Exec. Law § 296(1)(a)—if the individual is "shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 542 (1984). Alternatively, an individual may be liable under section 296(6), which forbids "any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the NYHRL], or attempt to do so." N.Y. Exec. Law § 296(6). Accordingly, "a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable" under the NYHRL. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). As discussed above, Plaintiff has demonstrated there are triable

issues of facts concerning the individual Defendants' participation in the alleged acts of discrimination, (*see supra* Part VI.C.2); therefore, a basis for individual liability, to be proved at trial, exists under the NYHRL.

Defendants argue that "Plaintiff's failure to file a notice of claim requires the dismissal of his claims" under the NYHLR. (Dkt. No. 51-32). That argument sweeps too broadly because, while section 52 of the County Law requires a notice of claim for NYHRL claims against a county, that same section provides that the notice of claim "must be made and served in compliance" of section 50-e of the Municipal Law, which in turn states that a notice of claim is not required if the municipality has no obligation to indemnify its employees. But "[a]cts of workplace harassment and other intentional torts are generally not considered conduct within the scope of employment since they are often motivated by personal reasons." *George v. N.Y.C. Transit Auth.*, No. 04-cv-3263, 2008 WL 4274362, at *3, 2008 U.S. Dist. LEXIS 113128, at *8 (E.D.N.Y. Aug. 21, 2008), *report-recommendation adopted by* 2008 WL 4274362, 2008 U.S. Dist. LEXIS 76288 (E.D.N.Y. Sept. 17, 2008). Viewed in the light most favorable to Plaintiff, and considering the County's own policies against harassment and discrimination, the record in this case indicates that the racial comments to which the individual Defendants subjected Plaintiff were not within the scope of their employment—indeed, these acts were prohibited. Accordingly, the Court concludes that Plaintiff was not required to serve the County with a notice of claim for the NYHRL claim against the individual Defendants.[35] Summary judgment is denied as to that claim.

---

[35] This conclusion holds even though the NYHRL claim cannot proceed against the County itself. *See Johnson v. County of Nassau*, 82 F. Supp. 3d 533, 539 (E.D.N.Y. 2015) ("That a judgment under the NYSHRL cannot be obtained against the County itself because of plaintiff's failure to file a notice of claim does not preclude plaintiff from attempting to prove that the County encouraged, condoned, or approved DaSilva's alleged discriminatory conduct and that DaSilva aided and abetted that violation through his own conduct under Section 296(6).").

#### d. Intentional Tort Claims Against Individual Defendants

A municipality is not obligated to indemnify its employees for intentional torts. *See* N.Y. Pub. Off. Law § 18(4)(b) ("Except as otherwise provided by law, the duty to indemnify and save harmless . . . shall not arise where the injury or damage resulted from intentional wrongdoing or recklessness on the part of the employee."); *accord Seale v. Madison County*, 929 F. Supp. 2d 51, 72 (N.D.N.Y. 2013) ("Where, according to a plaintiff's complaint, the defendant county employees were acting outside the scope of their employment, i.e., by the commission of intentional torts, the filing of a notice of claim is unnecessary."). Resolution No. 168 of 190 specifies that the "duty to indemnify and save harmless . . . shall not arise where the injury or damage resulted from bad faith, recklessness, criminal act or was not within the employee's scope of employment." (Dkt. No. 57-1, at 3). Additionally, in 1999, the County legislature enacted Resolution No. 52, reiterating the County's policy not to "pay in certain instances the costs of defense for intentional misconduct or acts taken in bad faith" and requiring the County Attorney to consider legal action "to recover any moneys expended by the County for representation of said officer or employee by private counsel." (*Id.* at 5). Based on this language, the Court concludes that the County did not intend to indemnify the individual Defendants for the alleged racial discrimination and harassment which underpins Plaintiff's claims for tortious interference and prima facie tort. Failure to serve a notice of claim, therefore, is not grounds for dismissing these intentional tort claims.[36]

---

[36] Defendants also argue that the claims are untimely under the Municipal Law, (Dkt. No. 51-32, at 24), which requires that tort law claims against municipalities be filed within one year and 90 days of their accrual, N.Y. Gen. Mun. Law § 50-i(1)(c). But Defendants cite no authority for applying this limitations period to tort law claims against individual employees where no notice of claim is required. The Court declines to reach that unbriefed issue.

## 2.    Breach-of-Contract Claim

Plaintiff alleges that a contract existed between Plaintiff and the County, that the contract guaranteed Plaintiff "a work environment free from racial discrimination and harassment," and that the County breached the contract by allowing racial discrimination and harassment to persist at his workplace. (Dkt. No. 2, ¶¶ 46–48). However, as Defendants correctly argue, (Dkt. No. 51-32, at 25), "it is well-established that an employer's antidiscrimination policies and manuals cannot serve as the basis for a breach of contract claim," *Lai v. Deiorio Foods Inc.*, No. 15-cv-195, 2016 WL 814930, at *7, 2016 U.S. Dist. LEXIS 25160, at *21 (N.D.N.Y. Feb. 29, 2016) (internal quotation marks omitted). This is because a "general statement of equal opportunity and nondiscrimination contained in an employee handbook . . . is nothing more than a statement of existing law concerning discrimination, [and] may not serve as a basis for a breach of contract claim." *Blaise-Williams v. Sumitomo Bank, Ltd.*, 189 A.D.2d 584, 586 (1st Dep't 1993). Plaintiff does not respond to that argument. The Court therefore grants Defendants' motion for summary judgment on the breach-of-contract claim.

## 3.    Tortious Interference

Plaintiff alleges that Defendants interfered with Plaintiff's contractual or prospective economic relationship with the County in creating "a work environment which was not free from racial discrimination and harassment, and in causing Plaintiff to be terminated." (Dkt. No. 2, ¶¶ 51–53). Plaintiff was an at-will employee; therefore, under well-established New York law, Plaintiff may bring a claim for tortious interference with prospective economic relationship, not tortious interference with contract. *See Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 192 (1980). Under New York law, the elements of a claim for tortious interference with prospective economic relationship are: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted solely

out of malice (i.e., with the sole purpose of harming the plaintiff) or used wrongful means; and (4) there was resulting harm to the business relationship. *See Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000). "Wrongful means" are typically "acts that would be criminal or independently tortious," or amount to "extreme and unfair" economic pressure on "the party with which the plaintiff has or seeks to have a relationship." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192 (2004)

Defendants' first argument for dismissal is that the individual Defendants are not third parties to the economic relationship. (Dkt. No. 51-32, at 26). Under New York law, "an agent cannot be held liable for inducing its principal to breach a contract with a third person where the agent is acting on behalf of its principal and within the scope of its authority"—a principle that has also been applied to claims for tortious interference with prospective economic relationship. *First Tr. Nat'l Ass'n v. Moses & Singer*, No. 99-cv-1947, 2000 WL 1093054, at *7 & n.5, 2000 U.S. Dist. LEXIS 10957, at *22 & n.5 (S.D.N.Y. Aug. 4, 2000). But as discussed at length above, Plaintiff has put forth evidence that the individual Defendants subjected him to racial discrimination and harassment—conduct which was prohibited by the County's own policies and may reasonably be understood as falling outside the scope of the individual Defendants' employment. Defendants' argument for dismissal is that the individual Defendants did not use wrongful means. (Dkt. No. 51-32, at 26). But a reasonable jury could conclude that they acted solely out of malice—that racial animus drove them to put together negative performance evaluations to cause Plaintiff's termination. *See Mansour v. Abrams*, 144 A.D.2d 905, 906 (4th Dep't 1988). Lastly, Defendants question that Plaintiff can show but-for causation linking the individual Defendants' action to the nonextension of the economic relationship between Plaintiff and the County. (Dkt. No. 51-32, at 27). Causation, however, is a disputed issue of material fact,

which a jury will have to determine. In sum, the Court denies summary judgment on the tortious interference claim against the individual Defendants.

### 4. Prima Facie Tort

Defendants seek to dismiss the prima facie tort claim, noting that such a cause of action is meant to provide relief for harm that falls outside of the traditional tort categories, and also arguing that Plaintiff has not shown sole malice. (Dkt. No. 51-32, at 27). The elements of prima facie tort under New York law are: "(1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that would otherwise be lawful." *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990) (citing *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 332 (1983)). Courts have dismissed prima facie tort claims that were duplicative of claims for discrimination and harassment. *See Gallagher v. N.Y.C. Health & Hosps. Corp.*, No. 16-cv-4389, 2017 WL 4326042, at *1, 2017 U.S. Dist. LEXIS 155259, at *22 (S.D.N.Y. Sept. 20, 2017), *aff'd*, 733 F. App'x 3 (2d Cir. 2018); *Woytisek v. JP Morgan Chase & Co.*, 46 A.D.3d 331, 331 (1st Dep't 2007) (affirming the dismissal of a "plaintiff employee's claim alleging prima facie tort [as] proper where it was based upon the same allegations of harassment and discrimination" as other asserted claims). As prima facie tort is duplicative of other triable claims in this case, the Court grants summary judgment to Defendants on that claim.

### E. Doe Defendants

Defendants seek dismissal of the Doe Defendants because Plaintiff "has had ample opportunity to identify" them, yet "made no effort to do so." (Dkt. No. 51-32 , at 27). Plaintiff does not respond to that request. Therefore, the Doe Defendants and any claims asserted against them are dismissed.

### F. Punitive Damages

Defendants argue that Plaintiff is not entitled to punitive damages against the County because "punitive damages will never lie against a municipality" or against the individual Defendants because "Plaintiff offers no evidence that that [they] recklessly or carelessly disregarded his rights." (*Id.* at 28). The latter proposition is clearly unsupported. Nevertheless, the Court agrees that the punitive damages request must be stricken as against the County. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (holding that a municipality is immune from punitive damages under § 1983).

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 51) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that the Title VII claims (first and third causes of action) are **DISMISSED with prejudice** as against the individual Defendants; and it is further

**ORDERED** that the NYHLR claims (second and fourth causes of action) are **DISMISSED with prejudice** as against the County; and it is further

**ORDERED** that the negligence claim (seventh cause of action) is **DISMISSED with prejudice** in its entirety; and it is further

**ORDERED** that the breach-of-contract claim (eighth cause of action) is **DISMISSED with prejudice** in its entirety; and it is further

**ORDERED** that the tortious interference claim (ninth cause of action) is **DISMISSED with prejudice** as against the County; and it is further

**ORDERED** that the prima facie tort claim (tenth cause of action) is **DISMISSED with prejudice** in its entirety; and it is further

**ORDERED** that the Doe Defendants and any claims against them are **DISMISSED with prejudice**; and it is further

**ORDERED** that the request for punitive damages is **STRICKEN** as against the County.

**IT IS SO ORDERED.**

Dated: September 21, 2018
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge